IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICHARD ROGGE and CONNIE ROGGE,   §
Individually and as Next          §
Friends of RICHARD HOLLAS         §
ROGGE,                            §
                                  §
      Plaintiffs,                 §
                                  §
v.                                §     CIVIL ACTION NO. H-11-4201
                                  §
THE CITY OF RICHMOND, TEXAS,      §
TODD GANEY, and DANELL GAYDOS,    §
                                  §
      Defendants.                 §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Defendants' Motion for Summary Judgment (Doc. 28) and Defendants' Objections and Motion to Exclude, or Alternatively Limit, the Testimony of Plaintiffs' Expert Witnesses (Doc. 32). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendants' summary judgment motion be **GRANTED**. Defendants' motion to exclude is **DENIED AS MOOT**.

## I.  Case Background

Plaintiffs filed this civil rights action against Defendants The City of Richmond, Texas, ("City"), Todd Ganey ("Ganey"), and

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 9.

Danell Gaydos ("Gaydos"),[2] alleging that Defendants violated Plaintiffs' son's constitutional rights and Texas state law while he was detained at Defendant City's jail.

## A.  <u>Factual Background</u>

On February 27, 2011, Plaintiffs' son, Richard Hollas Rogge ("Rogge"), was traveling home from playing golf at Fort Bend Country Club when he was involved in a motor vehicle accident at approximately 5:15 in the evening.[3]  Rogge did not stop after the collision but continued for approximately one-half mile where he was stopped by an off-duty Defendant City police officer who witnessed the accident and gave chase.[4]  The husband of the other driver had been following her in a separate vehicle, witnessed the accident, and chased after Rogge as well.[5]

The off-duty officer radioed Defendant City Police Department because the accident and the stop occurred within the limits of Defendant City.[6]  After making the call, he approached Rogge who

---

[2]     The court refers to Defendants Ganey and Gaydos collectively as "Defendant Officers" where appropriate.

[3]     Doc. 31-3, Ex. 2 to Pls.' Resp. to Defs.' Mot. for Summ. J. ("Pls.' Resp."), Def. Ganey's Decl. p. 1; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[4]     Doc. 31-12, Ex. 11 to Pls.' Resp., Officer T. Kraus' ("Officer Kraus") Supplemental Report p. 000009; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[5]     <u>See</u> Doc. 31-12, Ex. 11 to Pls.' Resp., Officer Kraus' Supplemental Report p. 000009.

[6]     <u>See id.</u>

remained in his vehicle.[7]   At that point, the officer smelled alcohol and noticed that Rogge's eyes were bloodshot.[8]   The off-duty officer directed Rogge to get out of the vehicle and to stand at its rear with his hands on the back window.[9]

Defendant Ganey arrived on scene and assumed control of the scene and investigation.[10]   He consulted the off-duty officer and questioned the husband of the other driver, who stated that he wished to file charges against Rogge for failing to stop and give information.[11]

Defendant Ganey then turned his attention to Rogge.[12]   Rogge answered all of Defendant Ganey's questions and complied with all of his requests.[13]   Rogge informed Defendant Ganey that he had been terminated from his job.[14]   Rogge admitted that he consumed beer

---

[7]      Id. p. 000010.

[8]      Id.

[9]      Id.; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[10]      See Doc. 31-12, Ex. 11 to Pls.' Resp., Officer Kraus' Supplemental Report p. 000010; Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000006.

[11]      Doc. 31-12, Ex. 11 to Pls.' Resp., Officer Kraus' Supplemental Report p. 000010; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.  Upon her arrival, the other driver in the accident also stated that she wanted to pursue criminal charges against Rogge.  Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000008; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[12]      See Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[13]      See Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[14]      Id.

3

while at the golf course.[15]  He also informed Defendant Ganey that he was prescribed Klonopin in a dosage of .5 milligram four times per day.[16]  Rogge described Klonopin as a "weak valium," which had been prescribed for "anti-anxiety," and stated that he had ingested his last prescribed dose for the day about 2:00 p.m.[17]  Defendant Ganey conducted the Standardized Field Sobriety Test, after which he took Rogge into custody for suspicion of driving while intoxicated ("DWI").[18]  Rogge refused to submit to a breath analysis.[19]

Defendant Ganey radioed a request to Defendant Gaydos to check Rogge's DWI criminal history, and she found one prior conviction for DWI, which she reported to Defendant Ganey.[20]  While completing an inventory slip for Rogge's vehicle in preparation for it being towed, Defendant Ganey found an open sixteen-ounce beer can in a brown paper bag, an unopened sixteen-ounce beer can in a brown

---

[15]    Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[16]    Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.  Rogge later stated that he took two .5 milligram doses twice per day.  Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[17]    Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[18]    Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[19]    Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[20]    Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007.

4

paper bag, and an open bottle of whiskey.[21]

At Defendant Ganey's request, Officer D. Childs ("Officer Childs") transported Rogge back to Defendant City's police department, rather than to Fort Bend County Jail.[22] During the two-minute journey, Rogge did not say anything.[23] Officer Childs noticed that Rogge was unsteady on his feet as he got out of the patrol car.[24] After escorting Rogge into the booking area of the police station, the officer checked all of Rogge's pockets for contraband, removed his baseball hat, removed the handcuffs, and asked Rogge to remove his belt, watch, shoes, and necklace.[25] Officer Childs escorted Rogge to a holding cell at approximately 6:18 p.m.[26] Rogge was cooperative throughout the process.[27]

The cell had two benches, one along each of two of the walls, and a partition that partially blocked the view of a toilet and

---

[21]     Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p. 000007; Doc. 31-32, Ex. 31 to Pls.' Resp., Arrest Video.

[22]     See Doc. 31-15, Ex. 14 to Pls.' Resp., Officer D. Childs' Report p. 000015.

[23]     See Doc. 31-15, Ex. 14 to Pls.' Resp., Officer D. Childs' Report p. 000015; Doc. 31-33, Ex. 32 to Pls.' Resp., Transport Video.

[24]     Doc. 31-15, Ex. 14 to Pls.' Resp., Officer D. Childs' Report p. 000015.

[25]     Id.; Doc. 31-35, Ex. 34 to Pls.' Resp., Booking Video.

[26]     Doc. 31-15, Ex. 14 to Pls.' Resp., Officer D. Childs' Report p. 000015; Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video; Doc. 31-35, Ex. 34 to Pls.' Resp., Booking Video.

[27]     Doc. 31-15, Ex. 14 to Pls.' Resp., Officer D. Childs' Report p. 000015; see also Doc. 31-35, Ex. 34 to Pls.' Resp., Booking Video.

sink area from a window in the cell door.[28]  The entire cell was visible by camera, which transmitted a live feed to the dispatch center that displayed on a monitor located above Defendant Gaydos, who was answering and dispatching calls.[29]

Upon his return to the station, Defendant Ganey began reviewing Rogge's criminal history and determining the appropriate charges.[30]  He was interrupted when Defendant Gaydos dispatched several disturbance calls.[31]  Officer Childs was dispatched to one of the calls about 6:20 p.m. and glanced into Rogge's cell on his way out a few minutes later.[32]  Defendant Ganey also left the police station to answer another one of the disturbance calls and asked Defendant Gaydos "to keep an eye on" Rogge while Defendant Ganey was gone.[33]  Before Defendant Ganey returned to the station, Defendant Gaydos dispatched another call to which Defendant Ganey initially was en route but disregarded and returned to the station

---

[28]   Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[29]   See Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000032; Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video; Doc. 31-42, Ex. 41 to Pls.' Resp., Photograph of Dispatch Center.

[30]   Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000013.

[31]   Id.

[32]   Doc. 31-15, Ex. 14 to Pls.' Resp., Officer D. Childs' Report p. 000015; Doc. 31-37, Ex. 36 to Pls.' Resp., Exterior of Cell Video.

[33]   Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000013.

when other officers responded to the call.[34]   Throughout the
duration of Defendant Ganey's absence, Rogge was lying down and
sleeping.[35]

Defendant Ganey immediately returned to his review of Rogge's
criminal history when he arrived back at the station.[36]   Defendant
Ganey decided to charge Rogge with "Driving While Intoxicated 2nd -
open container (M-A) and Failure to Stop and Give Information."[37]
Defendant Ganey then began working on a probable cause statement
for the charges.[38]   He returned to his patrol unit to review the
video and uploaded the video to the police department's server.[39]

At 7:31 p.m., Defendant Gaydos answered a call from Rogge's
father, who asked if Rogge was in custody.[40]   She confirmed that he
was.[41]   Approximately thirty to forty-five minutes later, Rogge's
father appeared in person; he was advised of the charges against

---

[34]   Id.

[35]   Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000032; see
also Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[36]   Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report
p. 000013.

[37]   See Doc. 31-12, Ex. 11 to Pls.' Resp., Officer Kraus' Supplemental
Report p. 000010; Doc. 31-13, Ex. 12 to Pls.' Resp., Def. Ganey's Report p.
000008.

[38]   Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report
p. 000013.

[39]   Id.

[40]   Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000032.

[41]   Id.

Rogge and was provided with the wrecker information.[42]   Rogge's father asked to see and talk to Rogge, but the request was denied.[43] Rogge's father told Defendant Gaydos that he and his wife were "very concerned about this" and "very worried about this deal."[44] He asked Defendant Gaydos to tell Rogge that his father had been by "to check on him and [that his father would] get him out at Fort Bend County."[45] Defendant Gaydos relayed the message to Defendant Ganey.[46]

Later, while working on the paperwork, Defendant Ganey called Defendant Gaydos via telephone, asking that she look at the monitor to confirm what Rogge was wearing.[47]   Defendant Gaydos responded that she could not tell the color of his clothing from the black-and-white monitor but remembered that he was wearing an orange polo-style shirt and a white undershirt.[48]   Defendant Ganey also asked Defendant Gaydos if she could see Rogge, and Defendant Gaydos responded affirmatively and reported that Rogge was sleeping on the

---

[42]   Id.

[43]   See Doc. 31-9, Ex. 8 to Pls.' Resp., Richard Rogge's Dep. pp. 47, 48.

[44]   Id. pp. 47, 48.

[45]   Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000032.

[46]   Id.

[47]   Id.; Doc. 31-3, Ex. 2 to Pls.' Resp., Def. Ganey's Decl. p. 2; Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000013.

[48]   Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000013; Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000032-33.

bench.[49]

Rogge remained asleep on a bench until 8:25 p.m., when he went to the toilet to urinate.[50]  A few minutes later, he was lying back down on the bench.[51]  At 8:54, Rogge arose again, took off his outer shirt and left it on the bench.[52]  He moved to the toilet/sink area, took off a long-sleeve undershirt, and stepped first onto the toilet bowl and then onto the sink at the back of the toilet.[53]  Rogge reached up, out of the view of the camera, to tie his undershirt onto a grate covering a vent and then wrapped and tied another portion of the shirt around his neck.[54]  At 8:57 p.m., Rogge hesitantly stepped off the back of the toilet, hanging himself.[55]

When the night shift arrived at 9:00 p.m., Defendant Ganey asked one of the officers if he could transport Rogge to Fort Bend County Jail.[56]  Defendant Ganey then went to the booking area and looked into Rogge's cell for the first time; it was approximately

---

[49]     Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000013.

[50]     Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[51]     Id.

[52]     Id.

[53]     Id.

[54]     Id.; Doc. 31-39, Ex. 38 to Pls.' Resp., Photograph of Grate Covering Vent ; see also Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000014.

[55]     Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[56]     Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000014.

9

9:20 p.m.[57]  He did not see Rogge but saw his orange shirt on the bench.[58]  He retrieved the keys, opened the holding cell door, and called out to Rogge.[59]  When Rogge did not respond, Defendant Ganey entered the cell and found Rogge hanging from the grate above the toilet.[60]  Defendant Ganey immediately requested emergency medical services via radio.[61]  Defendant Ganey cut Rogge's shirt, laid him on the floor of the cell, and untied the shirt from around his neck.[62]

Upon hearing Defendant Ganey's request, Defendant Gaydos later recalled, she looked up at the monitor and saw Rogge lying on the cell floor with Defendant Ganey standing over him.[63]  Defendant Ganey and another officer pulled Rogge out of the cell, and a third officer administered cardiopulmonary resuscitation (CPR) until the emergency medical technicians arrived.[64]  Rogge was transported to

---

[57]  See id.; Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[58]  Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000014.

[59]  Id.

[60]  Id.; see also Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[61]  Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000014; Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video; Doc. 31-37, Ex. 36 to Pls.' Resp. Exterior of Cell Video.

[62]  Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000014; Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

[63]  Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000033.

[64]  Doc. 31-14, Ex. 13 to Pls.' Resp., Def. Ganey's Supplemental Report p. 000014; see also Doc. 31-37, Ex. 36 to Pls.' Resp. Exterior of Cell Video.

the OakBend Medical Center Emergency Room where he was pronounced dead a few minutes before 10:00 p.m.[65]

## B. Procedural Background

On November 9, 2011, Plaintiffs filed this action in the 268th Judicial District of Fort Bend County.[66]  On December 5, 2011, Defendants timely removed the action to this court pursuant to 28 U.S.C. §§ 1331 and 1441 based on federal question jurisdiction.[67] On December 13, 2011, Defendants collectively filed an answer.[68] After the court referred the case to the undersigned, Plaintiffs filed a first amended complaint.[69]

In their first amended complaint, Plaintiffs alleged claims in their individual capacities and as representatives of Rogge's estate.[70]  Plaintiffs alleged violations of the Eighth and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983").[71]  They also brought state law claims pursuant to the Texas Tort Claims Act,[72] as well as pursuant

---

[65]     Doc. 31-16, Ex. 15 to Pls.' Resp., Def. Gaydos' Report p. 000033; see also Doc. 31-17, Ex. 16 to Pls.' Resp., IAD Investigation Report p. 000419.

[66]     See Doc. 1, Notice of Removal p. 1; Doc. 1-2, Ex. B to Notice of Removal, Pls.' Original Pet. pp. 1, 19.

[67]     See Doc. 1, Notice of Removal pp. 1, 2.

[68]     See Doc. 3, Answer.

[69]     See Doc. 9, Order Dated Mar. 2, 2012; Doc. 18, 1st Am. Compl.

[70]     Doc. 18, 1st Am. Compl. p. 1.

[71]     Id. pp. 13, 15.

[72]     Tex. Civ. Prac. & Rem. Code §§ 101.001-101.109.

to the wrongful death and survival provisions[73] of the Texas Civil Practice and Remedies Code.[74]

In October 2012, Plaintiff designated two individuals as experts: 1) Jim Dozier ("Dozier"), a professor at Sam Houston State University, to offer his opinions on the sufficiency of the level of staffing at Defendant City's police department, the amount of training provided to its officers, the alleged failure of Defendant Officers to follow Defendant City's policies, and the alleged ratification by Defendant City of that failure to follow policies; and 2) Wayne Gondeck ("Gondeck"), a registered architect, to offer his opinions on "industry standards and practices regarding the design and construction of holding cells and the physical makeup of jail facilities."[75]  Following the close of discovery, Defendants timely filed the pending motion for summary judgment.[76]  The parties have fully briefed that motion.[77]  Defendants also filed the pending motion to exclude or limit the testimony of Plaintiffs' two experts, to which Plaintiffs filed a response.[78]

---

[73]    See Tex. Civ. Prac. & Rem. Code 71.001-71.022.

[74]    See Doc. 18, 1st Am. Compl. pp. 9-13.

[75]    Doc. 21, Pls.' Designation of Expert Witnesses pp. 2-3; Doc. 21-1, Ex. A to Pls.' Designation of Expert Witnesses, Dozier's Resume.

[76]    See Doc. 16, Order Dated May 31, 2012; Doc. 28, Defs.' Mot. for Summ. J.

[77]    See Doc. 31, Pls.' Resp. to Defs.' Mot. for Summ. J.; Doc. 34, Defs.' Reply; Doc. 35, Pls.' Resp. to Defs.' Reply; Doc. 36, Defs.' Surreply.

[78]    See Doc. 32, Defs.' Mot. to Exclude; Doc. 37, Pls.' Resp. to Defs.' Mot. to Exclude.

The court now addresses both pending motions.

## II.   Summary Judgment Motion

Defendants move for summary judgment on all of Plaintiffs' claims.  As to the Section 1983 claims, they contend that Rogge was not deprived of any constitutional right, that the individual defendants are entitled to qualified immunity, and that City policy did not cause any constitutional violation.  As to the state claims, Defendants assert that Defendant City is immune.

## A.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary

13

judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  Celotex Corp., 477 U.S. at 322.  However, if the party opposing summary judgment responds with evidence in support of each challenged element, the case must be resolved at trial.  Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not

14

carry this burden.  <u>Brown</u>, 337 F.3d at 541; <u>Ramsey v. Henderson</u>, 286 F.3d 264, 269 (5th Cir. 2002).  The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp.</u>, 477 U.S. at 322.

## B.  <u>Section 1983</u>

The court begins with Section 1983, the only federal cause of action asserted by Plaintiffs.

### 1.  Legal Standard

A plaintiff can establish a prima facie case under Section 1983[79] for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law.  <u>Doe v. Rains Cnty. Indep. Sch. Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995).  Plaintiffs allege violations of Rogge's Eighth and Fourteenth Amendment rights to protection against cruel and unusual punishment and to due process of law before the taking

---

[79]  The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

15

of liberty and life.

The Eighth Amendment[80] protection against cruel and unusual punishment extends to a prohibition against "deliberate indifference to the serious medical needs of prisoners." <u>Lawson v. Dallas Cnty.</u>, 286 F.3d 257, 262 (5th Cir. 2002)(citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). Deliberate indifference is subjective; that is, "the jail officials [must be] actually aware of the risk, yet consciously disregard[] it." <u>Id.</u> (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 839). The Eighth Amendment applies only to convicted prisoners, not to pretrial detainees. <u>See Jacobs v. W. Feliciana Sheriff's Dep't</u>, 228 F.3d 388, 393 (5th Cir. 2000); <u>Hare v. City of Corinth, Miss.</u>, 74 F.3d 633, 639 (5th Cir. 1996). As Rogge was a pretrial detainee at the time of his suicide, the Eighth Amendment affords him no protection.[81]

However, pretrial detainees enjoy the same rights as convicted prisoners to "constitutional essentials like medical care and safety," which includes "adequate protection from known suicidal tendencies," but those rights emanate from the Fourteenth

---

[80]    The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[81]    Plaintiffs conceded that Rogge was not protected from the harm alleged by the Eighth Amendment in their response, stating that his right to medical care is derivative of the Eighth Amendment "but flow[s] through the procedural and substantive due process guarantees of the Fourteenth Amendment." Doc. 31-1, Pls.' Resp. p. 3.

Amendment's due process guarantees.[82]  <u>Jacobs</u>, 228 F.3d at 393;
<u>Flores v. Cnty. of Hardeman, Tex.</u>, 124 F.3d 736, 738 (5th Cir.
1997); <u>see also</u> <u>Olabisiomotosho v. City of Houston</u>, 185 F.3d 521,
525 (5th Cir. 1999)(stating that the procedural and substantive due
process guarantees of the Fourteenth Amendment provide
constitutional protections to pretrial detainees); <u>Hare</u>, 74 F.3d at
639 (same).  The protection under the two amendments is so similar
that courts have adopted the deliberate indifference standard to
analyze pretrial detainees' claims of deprivation of "basic human
needs, including medical care and protection from harm" during
confinement.  <u>Jacobs</u>, 228 F.3d at 393 (quoting <u>Hare</u>, 74 F.3d at
650); <u>see also</u> <u>Hare</u>, 74 F.3d at 743 (adopting the subjective
deliberate indifference standard from Eighth Amendment cases to
apply to officers' constitutional obligations to provide pretrial
detainees with medical care and to protect them from harm and
violence).

Police officers will only be liable for episodic acts[83]
resulting in violations of pretrial detainees' rights if, in each
case, the officer "had subjective knowledge of a substantial risk

---

[82]    The Fourteenth Amendment states, in part: "No State shall . . .
deprive any person of life, liberty, or property, without due process of law .
. . ." U.S. Const. amend. XIV, § 1.

[83]    The Fifth Circuit distinguished between challenges to conditions of
confinement and episodic acts or omissions.  <u>See</u> <u>Olabisiomotosho</u>, 184 F.3d at
526.  Because Plaintiffs' complaint focuses on Defendant Ganey and Gaydos'
failure to protect Rogge from self-harm, it alleges an episodic omission.  <u>See</u>
<u>id.</u>; <u>Flores</u>, 124 F.3d at 738; <u>Hare</u>, 74 F.3d at 645.

of serious harm . . . but responded with deliberate indifference to that risk." Jacobs, 228 F.3d at 394 (quoting Hare, 74 F.3d at 650).  In other words, the officer must have had actual knowledge that the detainee was a suicide risk and consciously disregarded the detainee's need for protection from himself.  See Lawson, 286 F.3d at 262; Jacobs, 228 F.3d at 393.  Negligent action on the part of an officer does not implicate constitutional rights.  Jacobs, 228 at 395; Hare, 74 F.3d at 645-46; see also Lawson, 286 F.3d at 262-63 ("Deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone.").    In fact, deliberate indifference is a higher threshold than even gross negligence. Hare, 74 F.3d at 645.

Police officers, as state officials, have qualified immunity from Section 1983 suits for actions performed in the exercise of discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  By pleading qualified immunity in good faith, a summary judgment movant shifts the burden to the nonmovant to rebut the movant's assertion.  Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007).

In order to overcome an officer's assertion of qualified immunity, a plaintiff first must show that the officer violated a

constitutional right. <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002);
<u>Brumfield v. Hollins</u>, 551 F.3d 322, 326 (5th Cir. 2008)(citing
<u>McClendon v. City of Columbia</u>, 305 F.3d 314, 322-23 (5th Cir.
2002)). If no constitutional violation occurred, then the analysis
ends there. <u>Brumfield</u>, 551 F.3d at 326 (citing <u>Freeman v. Gore</u>,
483 F.3d 404, 410-11 (5th Cir. 2007)). If, on the other hand, a
violation did occur, the court considers whether the officer's
actions "were objectively unreasonable in light of clearly
established law at the time of the conduct in question." <u>Id.</u>
(quoting <u>Freeman</u>, 483 F.3d at 411).

To establish a county's liability under Section 1983, a
plaintiff must establish the elements of a prima facie case and
must demonstrate that the county "had some inadequate custom or
policy that acted as the moving force behind a constitutional
violation." <u>Forgan v. Howard Cnty., Tex.</u>, 494 F.3d 518, 522 (5th
Cir. 2007)(citing <u>Monell v. Dep't of Soc. Servs. of N.Y.</u>, 436 U.S.
658, 690-91 (1978)). In the context of a Fourteenth Amendment
claim that an officer failed to protect a pretrial detainee from
self harm, liability will attach to the county only if, in addition
to the officer's subjective deliberate indifference, the county
adopted or maintained a policy or custom with objective deliberate
indifference to the detainee's constitutional rights.
<u>Olabisiomotosho</u>, 185 F.3d at 526. In other words, the county
policymaker actually knew or should have known of the risk of

serious harm.  See Lawson, 286 F.3d at 264.

**2. Discussion**

In accordance with the above authority, the court begins its analysis with the common legal element for the individual defendants and the county: whether Rogge suffered a constitutional violation at the hand of either individual defendant.  The court must decide whether Plaintiffs point to sufficient summary judgment evidence to allow a reasonable jury to find that the "individual defendants were deliberately indifferent to [Rogge's] obvious need for protection from self-inflicted harm." Jacobs, 228 F.3d at 393.

Several Fifth Circuit cases provide guidance in this analysis. See id. at 388; Flores, 124 F.3d at 736; Evans v. City of Marlin, Tex., 986 F.2d 104 (5th Cir. 1993).  The oldest of these cases, Evans, was decided prior to the clear articulation of the appropriate standard by the Fifth Circuit in Hare.  Nevertheless, the Evans panel applied the subjective deliberate indifference standard in evaluating the actions of a city's police officers. See Evans, 986 F.2d at 107.

The plaintiff in Evans brought the action against a city in her individual capacity and as representative of her mother's estate after the mother committed suicide while in pretrial detention.  See id. at 106.  The detainee was arrested for public intoxication and placed in a cell alone, where she hanged herself with a garden hose that was normally used for washing down the jail

floors.  Id.  The court found that the evidence gave no indication
that the detainee would commit suicide, noting particularly that
she had not exhibited apparent suicidal behavior on the night of
her arrest and that she had been in the jail on prior occasions
without ever indicating an interest in self-inflicted harm.  Id. at
108.  The court concluded that the city could not be liable for its
alleged failure to train police personnel to detect potential
suicidal impulses because there was no evidence of manifest signs
that she was a danger to herself, which meant there was no
deprivation of a constitutional right.  See id.

In Flores, a pretrial detainee committed suicide by hanging
himself from a shower curtain rod with a piece of blanket.  See
Flores, 124 F.3d at 737.  Police arrested the detainee after a one-
hour standoff, "during which he stood on top of a building and
fired a rifle, hitting two police cars."  Id.  He was taken to jail
where he was booked and strip searched.  Id.  The county sheriff,
who had known the detainee all of his life and thought that he was
not acting like himself, ordered that the detainee be checked every
half hour and that he be stripped to his underwear and given
nothing more than a mattress and pillow.  Id.  The interior of the
cell in which he was placed was visible through a small window in
the door.  Id.

During the first night, the detainee did not "threaten or
attempt suicide or exhibit any overt signs that he intended to

21

commit suicide." Id.   The next morning, he declined breakfast before being escorted to his arraignment.   Id.   The judge set the detainee's bail at $225,000.   Id.   The detainee's father, who was at the hearing, testified that he had not suspected that the detainee was suicidal.   Id.   Upon return to the jail, the detainee was fingerprinted and was allowed to shower.   Id.   He was issued a blanket, a toothbrush, a cup, and soap.   Id.   The jail staff placed the detainee in a larger cell where he was checked once per hour. Id.   The view of the toilet and shower area of the larger cell was not visible from the outside.   Id.

The officer on duty visually checked the detainee at 12:31 p.m. and heard him over a sound monitor at 12:45 p.m.   Id.   But, at 1:20 p.m., the officer could not see the detainee, and he did not respond to calls.   Id.   When the officers entered the cell, they found that the detainee had committed suicide.   Id.

Although the court assumed that the sheriff had knowledge of the detainee's condition, it found insufficient evidence that the sheriff violated the detainee's due process rights.   Id. at 738. The court based its decision on several facts: the sheriff ordered protective procedures that were enforced for twelve hours; the sheriff exercised his judgment that the risk had subsided; and the detainee had engaged in conversation with various jailers, an inmate, a judge, and his father during that time without even hinting that he was suicidal.   Id. at 738-39.   The court remarked

22

that, although it may have appeared, in hindsight, that the sheriff's decision to discontinue protective procedures was ill advised, it did not rise to the level of deliberate indifference. Id. at 739.

In 2000, the Fifth Circuit separately analyzed the actions of a sheriff and two deputies related to the suicide of a pretrial detainee. Jacobs, 228 F.3d at 388. The pretrial detainee was arrested for attempted murder, and, at the time of her arrest, she informed the state troopers that she had attempted suicide by pulling the trigger of a loaded gun placed in her mouth but the gun had jammed. Id. at 390.

At the parish prison, the pretrial detainee was placed in a cell used for intoxicated inmates, inmates who needed to be isolated for safety reasons, and those designated for suicide watch. Id. The officers placed her on suicide watch, which, according to unwritten policy, meant checking on her every fifteen minutes, and notified other jail staff of the watch by leaving a note in the control center. Id. at 390, 398. Although the cell could be constantly observed from the control center, "a substantial portion" fell into a "blind spot." Id. at 390. The entire cell could be observed from the hallway. Id. The cell had several bars and light fixtures from which a makeshift rope could be suspended, and an inmate previously had committed suicide by hanging in that cell. Id.

23

On the morning after her arrest, the detainee saw a judge and was appointed counsel. Id. at 391. On the following day, the appointed attorney requested that the jail issue the detainee a blanket and a towel; instead, for unknown reasons, the detainee was given only a sheet. Id. Later that day, the sheriff opted not to move her to a cell with other women because the detainee expressed fear that they would hurt her. Id. She also requested that jail staff provide her with prescribed medication. Id. The detainee expressed no signs of suicidal ideation. Id. Nevertheless, the detainee committed suicide in the early morning of the next day. Id. As many as forty-five minutes elapsed between checks just before an officer found her hanging from the caging around a light fixture suspended by the sheet. Id.

The court analyzed the actions of each individual defendant separately. See id. at 395-98. It found that the evidence raised fact issues on the subjective deliberate indifference of the sheriff and one deputy but not of a second deputy. See id. With regard to the sheriff, the court found that he was aware of the detainee's pre-arrest suicide attempt and of the serious risk of making another attempt, he knew that she had been placed in a cell with a large blind spot and tie-off points but did not relocate her, he knew that another detainee had committed suicide by hanging with a blanket in the same cell, and he made the order to give the detainee a blanket and towel. Id. at 395. Any preventive measures

24

he took were not sufficient, according to the court, to mitigate his other decisions.  Id. at 395-96.

The court found that the senior deputy on duty at the time of the suicide also had actual knowledge of the detainee's suicide risk, knew about the earlier hanging in the same cell, and made the decision on where to hold her.  Id. at 397.  Although he did not issue the detainee a sheet, the court noted, he observed her in the cell with it and did not take it away.  Id.  The court also found that he did not check on the detainee as frequently as prescribed by the unwritten policy.  Id.

The other deputy had actual knowledge of the detainee's suicide risk but did not make the decision to place her in that particular cell, according to the opinion.  Id. at 398.  The court determined that he did not participate at all in making or following the order to issue the detainee bedding, that the evidence did not indicate that he knew of the prior suicide attempt, and that the deputy was "essentially following orders" that were not "facially outrageous."  Id.  Even though he did not comply with the policy on the frequency of checks, the court found that he was, at most, negligent.  Id.

With the information gained from its review of these and other pretrial detainee suicide cases, the court turns to the evidentiary facts in this case.  As Defendants Ganey and Gaydos did not act in unison throughout Rogge's detention, their actions must be

25

evaluated separately.   See Lawson, 286 F.3d at 262; Jacobs, 228 F.3d 395.   The critical issue is whether the summary judgment evidence would allow a reasonable jury to find that Rogge's "risk of suicide was sufficiently obvious, known, demonstrable, or manifest to establish a constitutional violation."   Whitt v. Stephens Cnty., 529 F.3d 278, 284 (5th Cir. 2008)(quoting Evans, 986 F.2d at 107-08)(internal quotation marks omitted).

### a. Defendant Ganey

The summary judgment record indicates that Defendant Ganey did not comply with procedures when he ordered that Rogge be taken to the Defendant City's jail and then failed to check on Rogge for several hours of detention.[84]   However, Defendant Ganey's failure to comply with these procedures does not constitute deliberate indifference if he was unaware of Rogge's risk of self harm.   See Whitt, 529 F.3d at 284.

Defendant Ganey stated that he was surprised by the suicide and that he did not know or even suspect that Rogge was a suicide risk.[85]   The evidence supports Defendant Ganey's testimony.   Rogge

---

[84]       A detainee had previously attempted suicide at the jail, using a different medium other than the grate in the ceiling.  That attempt was thwarted by jail staff.  Defendant Ganey stated that he was not aware of anyone having committed suicide at the jail but did not say whether he was aware of the previous attempt.  See Doc. 31-3, Ex. 2 to Pls.' Resp., Def. Ganey's Decl. p. 3.  Defendant Gaydos was aware of the prior attempt.  See Doc. 31-4, Ex. 3 to Pls,' Resp., Def. Gaydos' Decl. p. 2.  Regardless, whether anyone had attempted suicide at the jail is not material to whether Defendants Ganey and Gaydos knew that Rogge was at risk for self harm.

[85]       Doc. 31-3, Ex. 2 to Pls.' Resp., Def. Ganey's Decl. p. 3.

26

gave no indication that he was suicidal.[86]  None of the behavior he exhibited or information he provided to Defendant Ganey on the scene suggested such a risk.  Rogge remained calm throughout the investigation at the scene and cooperated with Defendant Ganey.  Although Rogge stated that he had been terminated from his job, admitted drinking, failed the sobriety tests, and revealed that he was on medication for anxiety, he did not express any interest in hurting himself or appear distraught and he stated that he had taken his full daily dosage of anti-anxiety medication as prescribed.

Moreover, no one else provided Defendant Ganey with information suggesting a risk.  Officer Childs expressed no concern based on his interaction with Rogge, who did not speak while in route to the police station and cooperated with Officer Childs after they arrived.[87]  The message Defendant Ganey received from Rogge's father did not raise a suspicion of suicide risk.[88]

Defendant Ganey noted that the offenses committed were misdemeanors and that he knew Rogge was familiar with the procedures because he had been arrested more than once, including

---

[86]     The court notes that Rogge's mother, father, and informal counselor all did not know Rogge to be suicidal.  See Doc. 31-9, Ex. 8 to Pls.' Resp., Richard Rogge's Dep. pp. 29-30; Doc. 31-10, Ex. 9 to Pls.' Resp., Connie Rogge's Dep. p. 15; Doc. 31-11, Ex. 10 to Pls.' Resp., John Lockhart's Dep. pp. 22-23.

[87]     See Doc. 31-3, Ex. 2 to Pls.' Resp., Def. Ganey's Decl. p. 3; Doc. 31-33, Ex. 32 to Pls.' Resp., Transport Video; Doc. 31-35, Ex. 34 to Pls.' Resp., Booking Video.

[88]     Doc. 31-3, Ex. 2 to Pls.' Resp., Def. Ganey's Decl. p. 3.

a prior DWI offense.[89]   Defendant Ganey further believed that all dangerous personal property had been taken from him and that Defendant Gaydos would monitor Rogge via the video feed.[90]

As with the detainee in Evans, Rogge was arrested for public intoxication, exhibited no manifest signs of suicidal ideation, and was placed in a cell alone.  See Evans, 986 F.2d at 106, 108.  Even though the officers in the Evans case may have been negligent in leaving the hose within reach of the detainee, the court found that they had not violated her constitutional rights.  Id. at 108.  The same is true of Defendant Ganey.

In Flores, the sheriff knew the detainee and thought he was not acting like himself; so, the sheriff ordered thirty-minute checks for the first night.  Flores, 124 F.3d at 737.  When the detainee exhibited no signs or expression of suicidal ideation that night and the following morning, the sheriff removed the protective procedures.  Id. at 738-39.  Given those facts, the sheriff was not liable for violating the detainee's constitutional rights.  See id. Here, Defendant Ganey had no personal knowledge of Rogge, and Rogge's behavior during their interaction revealed no sign that he might be suicidal.  Like the detainee's father in Flores, Rogge's father (as well as others who knew Rogge personally) did not suspect that he was suicidal.

---

[89]   Id.

[90]   Id.

The officers in <u>Jacobs</u> knew the detainee had reported attempting suicide immediately before her arrest and realized she presented a suicide risk.  See <u>Jacobs</u>, 228 F.3d at 390, 398.  Yet, the deputy who failed to check on her as frequently as required by policy was found by the court not to have acted with subjective deliberate indifference.  <u>Id.</u> at 398.  Even more so, then, Defendant Ganey's failure to check on Rogge, absent any knowledge that he presented a suicide risk, could not amount to subjective deliberate indifference.

### b.  Defendant Gaydos

Defendant Gaydos had no direct contact with Rogge.[91]  She did not observe on the video monitor any behavior on Rogge's part that suggested he was a suicide risk.[92]  "Rogge was not moving about the cell, did not display any indication he was emotionally upset[] or that he intended to engage in any activity other than sleeping during the several times I observed him on the video monitor."[93] The video shows that Rogge lay down on the bench about ten minutes after he entered the cell.[94]  During the subsequent approximately two-and-a-half hours prior to hanging himself, Rogge slept on the

---

[91]     Doc. 31-4, Ex. 3 to Pls.' Resp., Def. Gaydos' Decl. p. 2.

[92]     <u>Id.</u> p. 1.

[93]     <u>Id.</u>

[94]     <u>See</u> Doc. 31-36, Ex. 35 to Pls.' Resp., Interior of Cell Video.

bench, except for one three-minute trip to the toilet.[95]

Defendant Gaydos observed that Rogge did not have items of personal property considered implements for suicide.[96] She was not aware that he had been prescribed anti-anxiety medication.[97] Rogge's father expressed his and his wife's concern for Rogge but did not provide any information that suggested Rogge might be suicidal.

Defendant Gaydos had even less information about Rogge than Defendant Ganey, none of which could have given her any indication that Rogge was a suicide risk.

### c.   Summary

The summary judgment evidence does not raise a genuine issue of material fact as to whether Defendant Ganey or Defendant Gaydos had actual knowledge of the risk that Rogge would commit suicide. "[N]othing he did so clearly indicated an intent to harm himself that the [officers] caring for him could have only concluded that he posed a serious risk of harm to himself." Sibley v. Lemaire, 184 F.3d 481, 489 (5th Cir. 1999).  Officers are not experienced mental health professionals and are not required to detect latent suicidal tendencies. Evans, 986 F.2d at 107-08 (quoting Burns v. City of Galveston, 905 F.2d 100, 104 (5th Cir. 1990)).  Thus, no

---

[95]   See id.

[96]   Doc. 31-4, Ex. 3 to Pls.' Resp., Def. Gaydos' Decl. p. 2.

[97]   Id.

reasonable jury could find that either Defendant Ganey or Gaydos acted with deliberate indifference to Rogge's constitutional rights.  Because Plaintiffs have not met their burden of producing evidence of a constitutional violation, Plaintiffs' Section 1983 claims against each of the individual defendants and the county must be dismissed.  The court need not address any of Defendants' other arguments related to the Section 1983 claims.

**C.  State Claims**

If this recommendation is adopted, no federal claims will remain in this action.  Pursuant to 28 U.S.C. § 1376(c), which states that "district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction," the court should not maintain jurisdiction over the remaining state law claims.  See also Flores, 124 F.3d at 739.  Rather, the state law claims should be remanded to the 268th District Court of Fort Bend County.

### III.  Motion to Exclude

Defendants seek to exclude the expert opinion of Dozier because, they argue, he is not qualified to provide expert opinion testimony, he failed to use reliable principles and methods, and his opinions are irrelevant.  They also contend that Gondeck's opinions are irrelevant.

As explained above, the court's summary judgment decision

hinges on Plaintiffs' failure to meet their burden of producing some evidence of Defendant Officers' subjective deliberate indifference.[98] At best, the experts go no further than to suggest that Defendant Officers *should have known* of a substantial risk of harm, which amounts to nothing more than objective deliberate indifference.[99] Nothing in the experts' opinions and testimony informs the issue on which the court's decision is based. Therefore, the court has not relied on their opinions in deciding the pending summary judgment motion as to Plaintiffs' federal claims.

Because the court recommends remanding the state law claims, it will not consider the merits of Defendants' motion to exclude the testimony of Plaintiffs' experts.

### IV.   Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendants' summary judgment motion be **GRANTED**.

---

[98]    Plaintiffs cite to their experts' depositions and to Dozier's expert report as evidence that "the officers would have been trained, either through their academy, experience and/or [Texas Commission on Law Enforcement Officers Standards and Education] that alcohol and prescription medications were regarded as extreme suicide risks." Doc. 31, Pls.' Resp. p. 10 (citing Doc. 31-47, Ex. 46 to Pls.' Resp., Dozier's Dep. pp. 77-78; Doc. 31-48, Ex. 47 to Pls.' Resp., Gondeck's Dep. pp. 54-57; Doc. 31-52, Ex. 51 to Pls.' Resp., Dozier's Report). However, Plaintiffs' argument overstates those conclusions. The experts' remarks are based, in part, on incorrect understandings of the facts of Rogge's arrest. The resulting inferences and speculation do not support the conclusion that Defendant Ganey, much less Defendant Gaydos, actually knew that Rogge was a suicide risk.

[99]    See Doc. 31-47, Ex. 46 to Pls.' Resp., Dozier's Dep. p. 78; Doc. 31-48, Ex. 47 to Pls.' Resp., Gondeck's Dep. p. 57; Doc. 31-52, Ex. 51 to Pls.' Resp., Dozier's Report p. 1.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>16th</u> day of January, 2014.

Nancy K. Johnson
United States Magistrate Judge